CARAWAY, J.
|, These consolidated disputes are posses-sory actions brought by opposing owners with lands on opposite sides of the Red River. The disputed land was shown at trial to have been affected at various times by the continuous movement of the Red River since the original governmental surveys of the townships in 1839. This riparian land was determined by the trial court’s judgment to be now in the possession of the owner of the lands on the same side of the Red River where the disputed property is located. The owners of lands on the opposite side of the Red River were ordered pursuant to La. C.C.P. art. 3662 to bring a petitory action to establish their claim of ownership of the disputed property, and they appeal. For the following reasons, we affirm the trial court’s ruling.

Facts

These consolidated actions concern riparian land on either side of the Red River in northern Caddo and Bossier Parishes. On the westerly side[1] of the Red River, Jack Dominick, Jr. (hereafter “Dominick”), and his ancestors have held title to 830 acres called the Manilla Plantation since 1929. Manilla Plantation extends to lands north of the center (east/west) line of fractional Section 4, Township 22 North, Range 14 West and west of the Red River.
Harold H. Hollenshead (hereafter “Hol-lenshead”) and Gayle K. Hamilton and Gloria H. Hamilton, husband and wife (hereafter “Hamilton”), 12and their respective ancestors have maintained title to two tracts of land in said fractional Section 4 and in Section 33, Township 23 North, Range 14 West (hereafter the “H & H Property”)[2] lying east of the present bed of the Red River. The H & H Property consists of a 31.018-acre tract in the northeast corner of Section 4 and 99.355 acres in the south half of the south half of Section 33, all of which land presently lies east of the Red River. Hollenshead and Hamilton are undisputedly in possession of the H & H Property.
The former deeds to the H & H Property of Hollenshead and Hamilton’s ancestors in title also apparently included addi *1053 tional lands in Section 4 and Section 33 west of the existing bed of the Red River (hereinafter the “Disputed Property”). Hollenshead and Hamilton claim that the location of the Red River in January 1839, as shown on the Official Map of the Northwestern Land District of Louisiana, is the western boundary of the Disputed Property as described in the deeds of their ancestors in title. The present location of the river lies to the east of that former location of the river and in between is the Disputed Property. Therefore, in 2001, Hollenshead and Hamilton hired a survey- or to trace the boundary of the center thread of the 1839 location of the river and to set stakes along that line. After Hol-lenshead posted the line according to the survey, this dispute began.
The extent of the possession now asserted by Dominick includes the land described in the deeds for Manilla Plantation and alleged alluvion or |sbatture lands that have attached to Manilla Plantation as the river moved eastward through the years. The Disputed Property according to Dominick is that alluvial land.[3] Dominick’s alleged activities on the Disputed Property consisted of grazing cattle, planting rye grass, and hunting and fishing. In the 1950s, Manilla Plantation was fenced to the river along the northern and southern boundaries to keep the cattle in.
During the trial, Hollenshead testified that he first acquired his property around 1989. Upon his acquisition, he began crossing the Red River in his boat and on his jet ski because he “knew” he owned land on the other side. Eventually, he and Hamilton exchanged the ownership in their adjoining parcels in Section 4 and Section 33 to become co-owners. Enoch French prepared the boundary survey for Hollenshead and Hamilton in April 2001, using the 1839 Government Survey Map. French identified certain flood events, one ostensibly occurring at some time between 1929 and 1939, and the other in 1945. Concerning the flood event in April 1945 that allegedly caused the river to shift overnight, French said:
Well, it caused the river in this area to move basically to the alignment where it is today and it has continued to migrate to the east and to build up. This — this area right here, you’ve got a cut bank in that area that — that’s eating on the west | ¿bank. And then down in this area, you’ve got a cut bank that’s eating on the east bank. So it’s cutting here, building up in this inside right here and cutting here and building up down there.
Based upon French’s findings, Hamilton and Hollenshead assert that the changes in the river that occurred between 1929 and 1945 were avulsive events, so that their *1054 ownership of the Disputed Property was not lost by the gradual movement of the river and the principles of accretion. French confirmed that Hollenshead and Hamilton claimed the area lying east of the former thread of Red River as it flowed in 1838 or 1839.
Appellee’s father, Jack Dominick, Sr., first acquired Manilla Plantation. Jack Dominick, Jr., testified that he remembered walking around Manilla Plantation with his father from the time he was five years old, checking cattle and building fences. They would cross the levee, and watch the river. In particular, he testified about fencing on the property in reference to a 1955 aerial photograph:
A That’s '55. Of course, this was still wet in '55. You can see where the peninsula had eroded away and so this would have been the first land that — that he was really fencing to put cattle on. There were fences that went up to the river and of course, we had fences on the cotton land so the cattle couldn’t get back on the cotton fields and — They eat cotton, even- — even bolls of cotton. So this is the first place that there were fences later.
Q Let me ask you this. Over the years did you fence the entirety of the entirety of the alluvion?
A It was fenced — on the north side there was an east/west fence. On the south side there was also a fence that went in an easterly direction to the river.
Q All right, sir. And that would be a fence separating your property from your southern—
A East and northeast too.
Q Yeah, from your southern neighbor. A Right. To keep the cattle in.
|r,The Dominicks’ cows grazed on the Disputed Property until 1982, when Dominick and his father quit the cattle business and the herd was sold. Thereafter, the cotton fields and farm land were leased separately to the Dominick cousins for cultivation. Absent the grazing cattle on the sandbar, vegetation grew up, and only remnants of old fences remain visible. Nevertheless, Dominick testified that he still uses all of the property for farming and recreation, and is vigilant concerning protection of his possession.
Andrew C. Dominick, who leased Manilla Plantation for eight or ten years prior to the trial, testified concerning his planting of cotton, corn and soybeans on a portion of the land, particularly the Disputed Property over the levee. He remembered going “all back in there when he was a kid,” some 60 years ago, and denied any knowledge of adverse possession. A.C. Dominick corroborated Dominick’s testimony describing the old fence line along the southern boundary, and dated the original fence to the 1960s. A.C. Dominick “rode horseback back in there and helped get cattle up back in there for [Jack Dominick, Sr.].” On cross, A.C. Dominick confirmed that he encountered French while he was hunting in a deer stand and told French to leave the property.
Winfred Johnston testified that he was born on Manilla Plantation, and often fished on Red River. Johnston’s father leased land from Jack Dominick, Sr. and farmed it. Johnston observed Dominick working on fences, running cattle, and spoke to him when he was on the river.
| (¡Willis T. LaRue testified about hay work he did for the Dominicks in the late 1970s, on both sides of the levee, as follows:
A Well, I did it after — go back to eight-two, he got me to gather the cattle on that pasture. They was going out of the cattle business and over a period of three or four months from late spring of *1055 eighty-two until late summer I hauled cattle to Texarkana for him and — I kept up with the number of cattle and it was 385 head that we gathered and hauled.
Q All right, sir. And after that did you have any further connection with— A Yes, over the levee, now, I went over there during the drought of eighty-four and the hay was scarce and along— possibly even this time of the year of eighty-four or eighty-five. I put up hay over the levees where it had never been — you know, in recent years it hadn’t been anything done to the land. And I put up hay right up to the first sand bank of the river that — that time.
Q All right, sir. During that period of time were you — did you observe a fence—
A Yes.
Q —on the southern boundary?
A Yeah. It was maintained. It kept those cattle in there until eighty-two and eighty-four when I went — the road went down alongside that fence to the eastern part of it down to the river and it was— it extended throdgh some brush there on the — close to the river on down to the river. And I’m sure it was — it kept the cattle in until we sold them out of there. And — and I used that road. It crossed a pretty good slough and it had to be dry weather to really get across that slough. And — and I had some difficulty getting hay out of there after I — I rolled some of it on — -that winter after it started l’aining.
John Paul Hobbs testified concerning his hunting activities on Manilla Plantation from the late 1960s until 1990. According to his testimony, Jack Dominick, Sr. showed him where he could hunt east of the levee, and showed him the boundaries.
In January 2002, each side filed a separate suit against the other. These proceedings present two possessory actions. Dominick’s petition alleged peaceful possession of the land east of the levee which runs through Manilla Plantation. That land between the levee and the existing bed of the 17Red River includes the Disputed Property. Dominick’s asserted acts of possession consisted of continuous farming operations, grazing cattle, fencing, harvesting timber, and leasing for agricultural and oil and gas purposes. Hollenshead and Hamilton alleged quiet possession of their property according to their deeds. As to the alleged facts concerning their acts on the Disputed Property, the petition stated they “established posted signs” on the property on October 16, 2001. Three days later, they “returned to their property,” and found that Dominick and/or his agent had allegedly removed the surveyor’s stakes and posted signs.
After the trial, the trial court rendered its written opinion which found:
The testimony of Dominick and his witnesses, together with the other evidence submitted on his behalf prove by a preponderance that he and his family have continuously possessed the Manilla Plantation up to the bank of the Red River without interruption for a period of time well in excess of ten years.
In October and November of 2001 both parties were under the impression they had the right to possess the disputed property. In October and November of 2001 Hollenshead/ Hamilton individually or through their designated agents and employees violated Dominick’s peaceful possession of the property.
The trial court rendered judgment in the consolidated actions, rejecting Hollenshead and Hamilton’s possessory action and restoring Dominick’s possession of the 830.07 acre Manilla Plantation, together with all batture and riparian rights east to the present location of the Red River. The *1056 court further ordered Hollenshead and Hamilton to file a petitory action to assert | ¡¡any ownership claim within 60 days after the judgment becomes final. This appeal followed.

Discussion

To acquire possession, one must intend to possess as owner and must take corporeal possession of the thing. La. C.C. art. 3424. Corporeal possession is the exercise of physical acts of use, detention, or enjoyment over a thing. La. C.C. art. 3425. Possession is a matter of fact; nevertheless, one who has possessed a thing for over a year acquires the right to possess it. La. C.C. art. 3422.
The possessory action is one brought by the possessor of immovable property or of a real right therein to be maintained in his possession of the property or enjoyment of the right when he has been disturbed, or to be restored to the possession or enjoyment thereof when he has been evicted. La. C.C.P. art. 3655; Liner v. Louisiana Land & Exploration Co., 319 So.2d 766 (La.1975). The posses-sory action shall be brought against the person who caused the disturbance. La. C.C.P. art. 3656. In a possessory action, the sole object is the protection of possession and title is not an issue. Bennett v. Louisiana Pacific Corp., 29,598 (La.App. 2d Cir.5/9/97), 693 So.2d 1319, writ denied, 97-1552 (La.10/3/97), 701 So.2d 199.
To maintain the possessory action the possessor must allege and prove that: (1) he had possession of the immovable property or real right therein at the time the disturbance occurred; (2) he and his ancestors in title had such possession quietly and without interruption for more than a year immediately prior to the disturbance, unless evicted by force or fraud; (3) |9the disturbance was one in fact or in law, as defined in Article 3659; and (4) the posses-sory action was instituted within a year of the disturbance. La. C.C.P. art. 3658.
Hollenshead and Hamilton present to this court only one assignment of error, which states:
The trial court committed an error of law by ignoring a sudden flood or floods of Red River created land on the west side of Red River (but still located in Bossier Parish) by avulsive event(s) of Red River.
Because of such avulsive event, appellants claim that La. C.C. art. 502[4] operated to maintain their ownership of the Disputed Property lying west of the Red River after the avulsion. They argue that although their surveyor, French, “could not pinpoint exactly when the avulsive act(s) of the Red River occurred, he unequivocally testified” from the prior maps of the area, “it had to have occurred somewhere between 1929 and 1939.” From this, appellants conclude that French’s “opinion that it was caused by an avulsive act, rather than an action of accretion, places the ownership of the property in” the appellants. (Appellants’ Brief, emphasis supplied).
Appellants’ assignment of error and arguments asserting “ownership” are totally out of place in this possessory action. La. *1057 C.C.P. art. 3661. The 60 to 80-year-old alleged avulsive event has no relevance to the question concerning which of the parties had maintained acts of possession over the Disputed Property in the year and immediate time period before the parties 110came into conflict on the land in 2001. A party’s deeds of title are relevant in a possessory action only for the limited purposes enumerated under Code of Civil Procedure Article 3661, to show the extent of appellants’ possession. Likewise, an assertion of the legal principle for the maintenance of one’s ownership under La. C.C. art. 502 long after an avulsive event overlooks the importance of the actual possession of the property as expressly recognized by the last sentence of that code article. Corporeal possession which establishes one’s right to possession requires a showing in the possessory action of the facts of the exercise of physical acts of use, detention and enjoyment of the property. La. C.C. arts. 3424 and 3425.
Although appellants’ deeds and those of their ancestors in title may describe lands that once formed a contiguous tract located entirely on the east bank of the Red River, those lands are now divided by the present location of the river. The portion of appellants’ lands cut off by the river from them possession of the H & H Property east of the river is the Disputed Property. The question presented by their possessory action does not concern the fact that the Disputed Property was once described in appellants’ ancient deeds, or that its “ownership” by their ancestors was not lost by accretion but was maintained by the principles surrounding avulsion. The question of this possessory action is: What were the acts of corporeal possession by Hollenshead and Hamilton or their predecessors that had established their possession over the Disputed Property in 2001?” From this perspective, appellants’ petition for possession on its face suggested | ntheir lack of possession, as it alleged only their acts of surveying and posting the Disputed Property during a brief period of time in 2001 that never amounted to one year of corporeal possession and the establishment of their right of possession. They never alleged facts of their activities on the land that amounted to “possession quietly and without interruption for more than a year immediately prior to the disturbance” created by Dominick’s removal of appellants’ stakes and posted signs in 2001. La. C.C.P. art. 3658 and La. C.C. art. 3422.
With the appellants’ assignment of error making no challenge concerning manifest error in the trial court’s factual determination of Dominick’s possessory acts over the Disputed Property, we affirm the judgment which determined possession in his favor. Our recitation of the evidence above concerning Dominick’s activities on and the enclosure of the Disputed Property clearly demonstrates Dominick’s establishment of corporeal possession and the right of possession over the Disputed Property.

Conclusion

For the above reasons, the decision of the trial court is affirmed. Costs of the appeal are assessed to appellants.
AFFIRMED.

. We will refer in this opinion in the broad sense to the west and east sides of the Red River since the river generally runs from north to south. However, we recognize that due to the sharp turn in the river’s course tire disputed property in this case, while lying generally on the west side of the river, actually has the river as its boundary on its northeast side.

. In 2001, Hollenshead and Hamilton exchanged their interests in the tracts to become co-owners of the H & H Property.

. We note that the movement of the Red River has extended so far eastward that it now enters Section 3, Township 22 North, Range 14 West at approximately its northwest comer, curving southeasterly to approximately the center of that section, and then sharply curves back to the southwest, exiting Section 3 at its southwest corner. This horseshoe bend in the river means that any accretion formed east of Manilla Plantation as alleged by Dominick may extend into Section 3. Hol-lenshead and Hamilton have asserted no record title to lands in Section 3 held by themselves or their ancestors in title even though they appear to also contest the land west of the Red River in Section 3. Because Manilla Plantation’s south boundary line as appearing on Dominick's deeds only extends southward to the centerline of Section 4, any dispute regarding the ownership of the riparian lands in Section 3 lying west of the present location of the Red River, which might develop in the petitory action ordered by the trial court's judgment, would require as parties other owners with claims to the south half of Section 4 and the owners of tracts in Section 3, so that the conflicting claims under La. C.C. arts. 501 and 502 may be completely adjudicated.

. La. C.C. art. 502 provides:
If a sudden action of the waters of a river or stream carries away an identifiable piece of ground and unites it with other lands on the same or on the opposite bank, the ownership of the piece of ground so carried away is not lost. The owner may claim it within a year, or even later, if the owner of the bank with which it is united has not taken possession.